1      IN THE CIRCUIT COURT OF THE 18TH JUDICIAL CIRCUIT
              DU PAGE COUNTY, ILLINOIS

2

IT'S NICE, INC., d/b/a        )
3  HAROLD'S CHICKEN SHACK #83, an  )
Illinois Corporation,         )
4                         )
            Plaintiff,        )
5                         )
      -vs-            )  No. 20 L 547
6                         )    2-615 Motion
STATE FARM FIRE AND CASUALTY    )
7  CO.,                      )
                         )
8           Defendant.        )

9

10               REPORT OF VIDEOCONFERENCE PROCEEDINGS

11  had at the hearing of the above-entitled cause, before

12  the Honorable BRYAN S. CHAPMAN, DuPage County,

13  Illinois, recorded via Zoom and transcribed by

14  Kristin M. Barnes, Certified Shorthand Official Court

15  Reporter, commencing on the 29th day of September,

16  2020.

17

18

19

20

21

22

23  Kristin M. Barnes, CSR
    Official Court Reporter
24  CSR No. 084-004026

PRESENT:

    FRANKLIN LAW GROUP, by
    MR. RYAN ENDSLEY,

       appeared on behalf of the Plaintiff;


    SUDEKUM, CASSIDY & SHULRUFF, CHTD., by
    MS. FLORENCE M. SCHUMACHER and
    MR. FREDERICK J. SUDEKUM, III,

       appeared on behalf of the Defendant.

THE COURT:  All right.  Good morning, Counsel.

MR. ENDSLEY:  Good morning, your Honor.

THE COURT:  All right.  This is 20 L 547, It's Nice, Inc. versus State Farm Fire and Casualty.

We come on for a 2-615 motion in connection with It's Nice's claim for coverage under the policy.

I've had a chance to read the motion, the corresponding briefing, and I know there had been some motions for leave to file supplemental authority.  I have had a chance to look at those motions.

I assume both parties are okay with each side submitting their respective -- their respective briefs in support of their -- their respective authority in support of their positions.

Is that a fair characterization?

MR. ENDSLEY:  Yes, your Honor.  For It's Nice, at least.

THE COURT:  Sure.

MS. SCHUMACHER:  State Farm as well, your Honor, there's no objection.

THE COURT:  All right.  Why don't we go ahead and have the parties state their names for the record.

MS. SCHUMACHER:  Sure.

Florence Schumacher and Rick Sudekum here on

1    behalf of State Farm.

2         THE COURT:  Uh-huh.

3         MR. ENDSLEY:  Ryan Endsley on behalf of It's Nice,

4    Inc.

5         THE COURT:  Okay.  What I'd like to do here, guys,

6    I have spent considerable time with the -- with the

7    courtesy copies.  I've got my tabs.  Like I said, I've

8    read the authority.  I've read the additional authority

9    submitted.

10        I don't necessarily need a regurgitation of

11   the positions already taken in the briefs.  I feel like

12   I have adequately familiarized myself with the parties'

13   positions.

14        I do want to give the parties a chance to

15   make their record here.  I appreciate the issue and

16   that it's kind of a fastly moving issue through the

17   courts right now, and, as a result, I want to give the

18   parties a chance a make their record.

19        That said, I don't necessarily need, you

20   know, sort of, your Honor, this is how insurance

21   policies work.  I mean, tell me whatever you want to

22   tell me.  I may have a question or two for the parties,

23   but I'll let you make your record first.

24        State Farm, it's your motion.  I'll let you

1    go ahead if there's anything you want to add.

2          MS. SCHUMACHER:  Sure, your Honor.

3              I am going to briefly run through our

4    argument again, trying to sort of work in some of those

5    cases that have come in more recently.

6              I understand that the court is familiar with

7    insurance policies in general, so we won't -- hopefully

8    won't belabor you with too much elementary insurance

9    law here.

10             Obviously, the plaintiffs know -- or the

11   court knows that the plaintiff is seeking to recover

12   for a business interruption loss resulting from the

13   COVID-19 pandemic and the executive orders.

14             In our view, there are basically two main

15   barriers to plaintiffs being able to state a cause of

16   action.  The first is the lack of accidental direct

17   physical loss and the second is the virus exclusion.

18             The way I look at these, your Honor, it's

19   sort of like -- the lack of accidental direct physical

20   loss is like a 10-foot hurdle and the virus exclusion

21   is like a brick wall.  So even if the plaintiffs could

22   plead accidental direct physical loss, which they

23   can't, they're going to run right into the virus

24   exclusion and there's not going to be any coverage for

that reason either.

THE COURT: That was my -- that was the one thing I wondered a little bit about in reading your briefing, more the structure of your brief.

MS. SCHUMACHER: Right.

THE COURT: You led with the virus exclusion, and, to my mind, there's an insuring agreement here as a preliminary matter and we only get to the virus exclusion if the court finds that there is, in fact, accidental direct physical loss to the property in the first instance.

You would agree with that?

MS. SCHUMACHER: I would, your Honor.

THE COURT: Okay.

MS. SCHUMACHER: You know, the court is familiar -- it's the trigger of coverage. I mean, just like in a life insurance policy, until you have the death of the insured, there's no coverage to begin with.

It's the same for these policies. They're property policies, so their triggering coverage is accidental direct physical loss. You know, you can't just skip this part. It's the trigger of coverage. It's something that the plaintiff has the burden of

1     proof on.

2              So, in this case, the covered property is the

3     restaurant property, so the first question is, where is

4     the accidental direct physical loss pleaded, and our

5     response, obviously, is that it isn't.

6              So, you know, just looking briefly at the

7     complaint, you know, they allege that there was no

8     virus on the property and their accidental direct

9     physical loss argument is based on loss and use.

10             But, you know, my first point is, it has to

11    be accidental direct physical loss, and I think it's

12    undisputed that there was no difference to this

13    property physically on the day before these executive

14    orders were issued than there was on the day after, so

15    physically the property was exactly the same.

16             So where's the loss?  Where's the loss

17    they're arguing?  They're saying that loss of use is

18    sufficient, that they couldn't use the property in the

19    same way, and that somehow that constitutes accidental

20    direct physical loss to the property, and we disagree

21    with that position.

22             So we believe that the Illinois law and all

23    these cases that have recently come out correctly hold

24    that loss of use of property without any physical

1   change to that property cannot constitute accidental

2   direct physical loss.

3        THE COURT:  Mr. Endsley, at the risk of stealing

4   your thunder, I'm going to ask Ms. Schumacher

5   why don't you go ahead and respond to the western

6   district of Missouri cases that were cited by It's Nice

7   where it looks like some district courts in the western

8   district have found, you know, sort of a lack of

9   definition in the policy for physical damage or loss

10  of -- you know, what are the factual distinctions in

11  those cases, if any --

12       MS. SCHUMACHER:  Right, right.

13       THE COURT:  -- as to why the court should not find

14  those cases persuasive here as opposed to some of the

15  cases you've cited?

16       MS. SCHUMACHER:  Sure.

17            So the first thing I would say, the court

18  says there are courts in the western district of

19  Missouri.  What we actually have is one court -- it's

20  the same judge in the two cases -- who has gone

21  essentially the other way on this accidental direct

22  physical loss question.

23            Those cases are factually distinguishable on

24  two main grounds.  The first is that the plaintiffs in

1    those cases argue that they had virus on the premises.

2    So the plaintiff in this case has not even alleged that

3    there was any virus present.

4            The second distinction is in the policy

5    language.  So the trigger of coverage in those

6    policies, in the Studio 417 and the other case, were --

7    I think I've got the exact language here -- accidental

8    direct -- or accidental physical loss or accidental

9    physical damage.

10           And so the court in Studio 417 felt that it

11   had to somehow -- you know, focusing on that

12   disjunctive *or*, the court found that it had to give

13   separate meaning to physical loss and physical damage.

14           That's not the case in our policy.  There's

15   one trigger of coverage, which is accidental direct

16   physical loss to property.

17           We also have a virus exclusion, which wasn't

18   present in those cases, but I know the court is asking

19   me about physical loss.

20           So I would say the first and the most

21   important distinguishing factor is, obviously, the

22   pleading in this case -- I think it's in paragraphs, I

23   think, 25 and 36 of the complaint where the plaintiffs

24   specifically deny that they had any virus present on

1    premises.

2            And, again, I would disagree with Studio 417.

3    I'm not sure even in their presence a virus is enough.

4    Other courts have disagreed with that opinion as well,

5    but I think for our purposes in our compliant we have a

6    complaint that alleges the absence of the virus.  And

7    then, obviously, we have a policy that doesn't have

8    that *or* in there that the Studio 417 court seemed to

9    think was determinative.

10           THE COURT:  All right.  Anything else you want to

11   add?

12           MS. SCHUMACHER:  Just jumping briefly into the

13   virus exclusion, your Honor, in case we get there, we

14   have that anti-concurrent causation language which

15   broadly excludes coverage when a loss would not have

16   occurred in the absence of a virus.

17           That language, that anti-concurrent causation

18   language, has been upheld in Illinois.  The virus

19   exclusion clearly applies in this case.  There is no

20   requirement in that policy language that the virus be

21   physically present on the property, like plaintiff

22   alleges.  They're just adding language to the exclusion

23   which isn't present.  The exclusion needs to be applied

24   as written.  It unambiguously excludes a broad range of

losses.  Virus is one of them.

          Oh, the argument about, you know, the
proliferation issue, that somehow those two
subparagraphs of the virus exclusion need to be read
together, that's just not correct.  The virus portion
of that exclusion is separate.  It says that loss is
excluded, current virus, bacteria, or other
microorganism.

          So, again, I think it's -- I don't see how it
could possibly be ambiguous:  I mean, this -- clearly
we have a too late chain of causation here.  The virus
caused the executive orders which caused the loss and
it's excluded under the virus exclusion.

     THE COURT:  Okay.  Mr. Endsley, do you want to
respond to anything that's -- do you want to respond
with anything that's not in your brief?  Or if there's
a point or two you want to emphasize, I'm happy to give
you a chance to do so.

     MR. ENDSLEY:  Thank you, your Honor.

          So I just wanted to highlight a couple of
things.  In particular, we -- you know, the Studio 417
case, we have the same situation where State Farm
elected not to define physical loss or damage.  And, in
this case, while counsel has pointed out that this

policy only says physical loss, that's really the
broader of the two. Physical damage is what's probably
more in line with what State Farm's position is, which
is that a physical loss or damage must be a structural
alteration.

And the fact is that I think the Illinois
courts have not limited themselves quite so much to
structural physical alteration as State Farm would like
the court to believe. In particular, it's sort of an
all squares are rectangles argument. They cite cases
which are saying, you know, a change in color or shape
or appearance to the property is a physical loss or
damage, which is true, but that's not the only type of
physical loss.

And I think sort of looking at the asbestos
cases really sort of points that out, and State Farm's
position really throughout the briefs has been that
Illinois law requires a physical alteration to the
structure, and that's just not really what Illinois
case law actually says.

The other thing I'd sort of like to
highlight -- and this impinges a little bit on both the
virus exclusion and the physical loss or damage -- and
that's sort of the nature of an exclusion. And I know

that this is, you know, kind of a basic insurance
issue, but the fact is that an exclusion exists to
exclude coverage which would otherwise be present.

A virus cannot cause physical alteration to
the building, as far as I'm aware. If there's a way
that it can be done, State Farm certainly hasn't
articulated it. So at least this policy, as written,
clearly seems to contemplate nonphysical alterations
which would otherwise be covered causes of loss.

And that's a problem for the policy in a
couple -- for State Farm in a couple of ways in that
State Farm wants to apply the virus exclusion where it
was not present. Even in the absence of a virus
exclusion, if the governor had never closed the
building, It's Nice could never have made a claim
for -- under this policy because the coronavirus
existed somewhere. You know, even if there is
absolutely no virus exclusion in a different policy
like that, there just wasn't anything affecting It's
Nice's property.

And separately, with the physical loss or
use, when you're reading the policy, a number of these
exclusions, including, you know, both the virus
exclusion itself as well as the government closure

1    exclusion, really does contemplate under the policy

2    exclusions for nonphysical, nonstructural altering

3    causes of loss.

4          And that, to me, reads -- particularly when

5    State Farm has elected not to define loss or -- you

6    know, physical loss, that's a problem for them because

7    the policies seem to exclude things which wouldn't be

8    covered anyway under State Farm's interpretation, and

9    yet there they are.

10          Reading the policy as a whole and

11   constructing the ambiguities in favor of coverage,

12   certainly at this point dismissal seems premature.

13        THE COURT:  Counsel, do you have a response to the

14   virus exclusion argument that the -- as I understand

15   counsel's argument, it's that the virus -- if we were

16   to take State Farm's proffered definition of physical

17   as understood in insurance contracts, the virus

18   exclusion would never fit that definition because it's

19   never going to alter a physical structure.

20          I'm going to go to paragraph 23 of your

21   motion, page 10, where State Farm says, In cases

22   interpreting the word *physical* in insurance contracts,

23   *physical* is widely held to exclude alleged losses that

24   are intangible or incorporeal, such as detrimental

1    economic impact, unaccompanied by distinct demonstrable

2    physical alteration of property.

3              So how is the virus exclusion consistent with

4    that proffered definition of *physical*?

5         MS. SCHUMACHER:  Well, my first response, your

6    Honor, is I'm not sure we should assume that a virus

7    could never alter a structure.  We're not familiar with

8    every --

9         THE COURT:  Fair enough.

10        MS. SCHUMACHER:  -- virus in the world, so I think

11   that the exclusion -- you know, I look at it as sort of

12   a belt and suspenders approach.  I mean, surely I think

13   this virus is not causing physical damage, but that

14   certainly doesn't mean that there's no virus that could

15   ever develop that doesn't cause physical damage and

16   bodily injury.  We don't know that.  So I think, in a

17   sense, that the insurer clearly wanted to exclude this

18   kind of loss.

19             I think in the event that there is some

20   unexpected virus that comes up in the future that could

21   cause physical damage, I think the insurer is well

22   within its right to, you know, exclude that in the

23   event that that might happen some day.

24             It's clearly in the policy.  The insured was

1   aware of it.  It's a broad exclusion.  And, again, I

2   think their whole question is just based on the

3   assumption that all viruses are going to be like this

4   virus, and I just don't think that that's the case.

5           THE COURT:  Counsel, Mr. Endsley, let me ask you a

6   question.

7                   One of the things, as I've thought about this

8   case a little bit, I'm worried a little bit or I'm

9   concerned at least about, were the court to accept your

10  argument as to loss of use, I'm concerned about a

11  limiting principle or lack thereof in terms of what is

12  the underwritten risk here.

13                  And there appears to be, to my mind,

14  different types of coverage available for loss of use,

15  whether it is, in fact, civil authority when you think

16  about the cases right after 9/11 around the World Trade

17  Center.  There's a lot of case law coming down in the

18  southern district of New York in the second circuit

19  involving business interruption where civil authority

20  has retail shops shut down but you've got physical

21  damage to other property, ingress/egress sorts of

22  issues.

23                  Without the loss of use, sort of, well,

24  there's physical accidental physical loss to property

1    if I can't access it, that strikes me, when I look at

2    the policy in its entirety, to be potentially a very

3    different risk than what may have been contemplated

4    here.

5         Is that a fair concern?

6    MR. ENDSLEY:  So I think that is something of a

7    concern.  But to alleviate that a little bit, we're

8    dealing with a fairly unique set of circumstances and I

9    think there sort of still is a principle here.

10        If the governor's orders hadn't actually

11   required closure, if they, you know, had limited how

12   many patrons you could have in the restaurant or if

13   the -- you know, the effect of the general governor's

14   orders to shelter at home had been to reduce income,

15   you know, if we were talking about loss of income,

16   that's not a covered cause of loss.

17        And, in fact, I think some of the cases cited

18   by State Farm sort of indicate what the -- what the

19   difference is -- and those would be the Anchor

20   [phonetic] and Keach [phonetic] cases.  And,

21   particularly, those focused on the difference between

22   when something is actually completely closed down and

23   when it's merely suffered, you know, a loss of business

24   income, and there really is a significant difference

1    here.

2           And the other thing I would sort of add, as

3    far as a policy situation, is I think the tremendous

4    number of lawsuits we've seen from this is sort of an

5    indication that a lot of these insureds thought that

6    this would have been covered, something like this, and

7    learned only late in the game that it wasn't or at

8    least the insurance company thought it wasn't.

9           And I'd just sort of articulate again, you

10   know, the basic principle that ambiguities in the

11   policy are construed against the drafter.  State Farm

12   was the one who got to say what this policy looked

13   like, State Farm was the one who got to draft the

14   language of the policy, and, frankly, had put a lot

15   more thought into it than any of their insureds.

16          So I think to say that, you know, this wasn't

17   in the contemplation of the parties, it was at least a

18   little bit.  State Farm has a number of exclusions

19   which nearly but do not quite apply.  They were able to

20   draft around this.

21          And, frankly, exclusions exist in certain

22   policies which do address this specific concern.  We've

23   reviewed a couple of them from client -- from potential

24   clients who wanted coverage and actually saying that if

1  there's a government closure order because of a

2  pandemic, no coverage.

3         So there are ways for the insurer to protect

4  themselves from this, but in this case it's the insured

5  who really had this dropped on them unexpectedly and is

6  now having to litigate.

7     THE COURT:  Well, certainly, obviously, companies

8  and businesses around the world and certainly the

9  country and certainly Illinois are faced with a

10  remarkable predicament through largely no cause of

11  their own, if at all, as a result of the pandemic.

12         Let me be very clear.  I am not -- when I ask

13  the question about the limiting principle, I am not

14  suggesting that the court is trying to ascertain the

15  intent of the parties at this point.  I'm simply trying

16  to ascertain whether or not there's a reasonable

17  interpretation on the other side.

18         But wouldn't your argument, Mr. Endsley, be a

19  bit stronger if the definition or if the insuring

20  agreement language said insure for all accidental

21  direct physical loss of covered property as opposed to

22  to?

23         In other words, it's talking about -- I'm

24  concerned that we're reading direct physical to

1    property.  We're kind of just pretending that it

2    doesn't say what it -- what it clearly says and we're

3    kind of saying, well, loss of property or loss to

4    property, same thing, whatever.

5            Wouldn't you have a stronger argument if it

6    said loss of property?

7        MR. ENDSLEY:  In this case, I'm actually not sure

8    that we would, your Honor.

9            It's Nice still has the property, but the

10   property suffered a loss of use and that was a loss to

11   the property.  It's Nice hasn't -- you know, the

12   property isn't gone.  It's Nice has, in fact, recently

13   resumed business operations --

14       THE COURT:  So let me ask you a question.

15           If I said, when I think loss to the property,

16   I think the roof is blown off; okay?  That's what I

17   think of just -- at the very least, at a superficial

18   level.

19           If you're telling me a closing of the doors

20   by executive order is a loss to the property, help me

21   understand why that's the same thing.

22       MR. ENDSLEY:  Well, I think you're certainly

23   correct that, you know, when we think of -- that is

24   classic losses.

1    THE COURT:  That is, to my mind, closer to a loss

2    of property.  It's a functional loss of property, not

3    to property.

4    MR. ENDSLEY:  I guess the best argument I can sort

5    of think of, just off the spur of the moment, relates

6    to the fact that the type of property it is is what

7    affected the loss and that's -- because it's a

8    restaurant, this was a different type of loss.  If this

9    was just being used as residential housing, there is no

10   loss to the property.

11          So State Farm insured a particular type of

12   business and a particular -- that particular type was a

13   restaurant which was affected, and that impacted this

14   property.  That was a loss to this specific property

15   rather than a removal.

16          So to some extent, you know, if it said *loss

17   of property*, that, to me, almost suggests that

18   something -- a little more of the structural alteration

19   argument State Farm prefers, which is almost that

20   something was removed from the property or just ceased

21   to exist on the property -- because it was burned up or

22   something -- whereas I think *to property* sort of

23   suggests that it's anything that affects, you know,

24   that business property.  It wasn't just the -- you

1  know, this wasn't just a title policy or something like

2  that.  This was a business coverage policy.

3       THE COURT:  It doesn't say anything is physical;

4  right?

5       MR. ENDSLEY:  It does say physical.

6       THE COURT:  I mean, it's not any conceivable way

7  you're unable to use the property in the way you see

8  fit.  It's got to be direct physical loss.  And, I

9  guess, your view is loss of use, there's a physical

10  displacement; right?  That's --

11       MR. ENDSLEY:  Yes.

12       THE COURT:  -- your position?

13            Okay.  Ms. Schumacher, if there's anything

14  you want to respond to, I'll give you the last word.

15       MS. SCHUMACHER:  Sure.  There are many things.

16  I'm going to try to stick to a couple.

17            I think the Turek court actually discussed

18  that *physical loss to* concept and I think it held that

19  *to* implies contact and *physical* implies physical

20  contact, direct physical loss to property.

21            And I looked in the dictionary.  They gave

22  examples like a right uppercut to the jaw or applying

23  varnish to a surface.  Whatever theory they have about

24  their loss not being able to use the property, that

1   simply is not physical loss to that property.

2          And I just want to briefly touch on -- the

3   court is concerned about the breadth of their

4   interpretation.  So the first thing they said is, well,

5   this is a different situation because the restaurant

6   was required to be closed.

7          I would point out that in the executive

8   orders they did not close restaurants.  Restaurants

9   were permitted to stay open for takeout or delivery.

10  So regardless of whether they chose to close the

11  restaurant, even under their complaint, they weren't

12  required to.  So this is not a situation where

13  restaurants were closed.

14         The second and more broad point I would make,

15  your Honor, is that under their theory of accidental

16  direct physical loss, let's just say after COVID is

17  over the restaurant is open until 1:00 a.m.  There's an

18  ordinance that says restaurants have to close at

19  midnight now.  According to their theory, they now have

20  a loss of income claim because the restaurant has to

21  close an hour early because, according to them, there

22  doesn't have to be any physical impact; it just has to

23  affect the use of their property.

24         So, again, I agree with the court's concern

1      that their interpretation is way too broad and it

2      brings many more things into coverage than are intended

3      under a property policy which covers accidental direct

4      physical loss and then loss of income once that's

5      happened.  But you just can't skip that step.

6            And I think that's all I have.  I know the

7      court is familiar with all of this and there was a lot

8      that was said, but I'd like to keep it as brief as I

9      can.  So I think unless the court has any additional

10     questions, I think we've made our point.

11         THE COURT:  I think we -- I just want to make sure

12     all the parties agree that regardless of the coverage

13     form under the all risk policy, everyone agrees that

14     direct physical loss is required; right?

15         MR. ENDSLEY:  Yes.

16         THE COURT:  That phrase, that is an insuring

17     agreement that attaches to all.  You know, sometimes

18     these all risk policies, there's all these amendments,

19     you know, there's the general exclusions and then

20     there's the exclusions within the broad form coverage

21     and there's exclusions within that and those don't

22     apply to the general -- you know, so that was my review

23     of the policy, that there was no separate insuring

24     agreement, everything goes back to Section 1 property

1  insuring agreements, direct physical loss requirement.

2       MS. SCHUMACHER:  Yes.

3       THE COURT:  Okay.

4       MR. ENDSLEY:  Yeah, I believe there was a little

5  bit of confusion that we were maybe trying to get

6  coverage under the civil -- civil authority provision,

7  but that was --

8       THE COURT:  Well, as I understand your argument,

9  you'll take coverage wherever you can find it; right?

10      MR. ENDSLEY:  Yes, that's correct.

11           And that all relates back to the all risk

12  direct physical loss.

13      THE COURT:  Right.  Okay.  Very good.  Thank you.

14           Okay.  The court is in a position to rule on

15  this today.  The question presented by a 2-615 motion

16  to dismiss is whether sufficient facts are contained in

17  the pleadings that, if proved, would entitle the

18  plaintiff to relief.  That's Evers versus Edwards

19  Hospital, 247 Ill. App. 3d 717.

20           A motion to dismiss under Section 615 admits

21  all well-pleaded facts but does not admit conclusions

22  of law or conclusions of fact not supported by

23  allegations of specific fact.

24           Exhibits -- I assume the policy was, in fact,

1    attached to the complaint?

2         MS. SCHUMACHER:  It was -- your Honor, it was

3    either attached or filed by agreement.

4              I have two different cases.  One they

5    attached a partial policy and then --

6         MR. ENDSLEY:  Yeah, I --

7         MS. SCHUMACHER:  Was yours the partial policy?

8         MR. ENDSLEY:  Yeah, I believe it was attached by

9    agreement.

10        MS. SCHUMACHER:  Okay.

11        THE COURT:  The court is --

12        MR. ENDSLEY:  There was --

13        THE COURT:  The parties are asking the court to

14   consider the policy, right --

15        MR. ENDSLEY:  Yes.

16        MS. SCHUMACHER:  Yes, your Honor.

17        THE COURT:  -- for purposes of this motion?

18             All right.  So the policy is an exhibit to

19   the complaint for purposes of this motion.

20             Exhibits are part of the complaint to which

21   they are attached and the factual allegations contained

22   within an exhibit attached to a complaint serve to

23   negate inconsistent allegations of fact contained

24   within the body of the complaint.

1          I say that because, in some ways, this

2    operates almost more like a 12(b)(6) than -- most 615's

3    are sort of, if you haven't pled this element, you

4    haven't pled that element, and this operates more sort

5    of a -- whether or not there is a claim upon which

6    relief can be granted based on the complaint itself.

7          And, for that reason, I point out simply that

8    the exhibits to the complaint, which, in this case,

9    includes the policy, the parties have asked the court

10   to consider that as well.

11         Okay.  Having said all of that, the critical

12   language here, first, is the direct physical loss

13   language, and the court finds that direct physical loss

14   unambiguously requires some form of actual physical

15   damage to the insured premises to trigger coverage.

16         The words *direct* and *physical*, which modify

17   the word *loss*, ordinarily connote actual demonstrable

18   harm of some form to the premises itself rather than

19   force the closure of the premises for reasons

20   extraneous to the premises itself or adverse business

21   consequences that flow from such closure.

22         Defense counsel -- I'm sorry, the insurance

23   counsel points out here that Illinois courts have not

24   squarely addressed direct physical loss in this

1    context, but I do want to note in cases interpreting

2    the word *physical* in insurance contracts, *physical* is

3    widely held to exclude alleged losses that are

4    intangible or incorporeal in Illinois, such as

5    detrimental economic impact unaccompanied by a distinct

6    demonstrable physical alteration of the property.

7             That's One Place Condo, LLC, versus

8    Travelers, 2015 Westlaw, Northern District of Illinois,

9    applying Illinois law.

10            The other case here that, I think, is

11   particularly useful is, in fact, Judge Gettleman's

12   decision in the northern district of -- I want to get

13   this right -- Sandy Point Dental v. Cincinnati

14   Insurance.  This is 2020 Westlaw 5360465 dealing with

15   very similar facts and similar policy language.

16            In this case, the court finds, just as in

17   that case, plaintiff simply cannot show any such loss

18   as a result of either inability to access its own

19   office or the presence of the virus on its physical

20   surface, the latter of which here plaintiff fails to

21   allege in its complaint.

22            I don't think that's in dispute.  There's no

23   argument that the coronavirus was, in fact, on the

24   surface of the property.  The plaintiff has not pled

any facts showing physical alteration or structural

degradation of the property, which is required to

trigger coverage under this all risks policy.

      The court wants to note that in addressing

this insuring agreement argument, this holding is

consistent with other courts that have evaluated

whether the coronavirus causes property damage

warranting insurance coverage.

      Again, I want to reference 20 L -- I'm sorry,

not 20 L.  2020 Westlaw 5360465.  That's Sandy Point

Dental versus Cincinnati Insurance.

      I want to further note that Social Life

Magazine versus Sentinel Insurance Company, denying a

motion for preliminary injunction because the

coronavirus does not cause direct physical loss;

therefore, no coverage was required.  The coronavirus,

quote, damages lungs.  It doesn't damage printing

presses, close quote.

      Diesel Barbershop versus State Farm Lloyds,

2020 Westlaw 4724305, Western District of Texas,

August 13, 2020, granting a motion to dismiss because

the coronavirus did not cause a direct physical loss

and, quote, the loss needs to have been a distinct

demonstrable physical alteration of the property, close

quote.

I further want to direct the parties'
attention to Gavrilides Management versus Michigan
Insurance Company.  This is a state court of Michigan
handing down a decision last month that was cited by
State Farm in this case explaining that direct physical
loss to property requires tangible alteration or damage
that impacts the integrity of the property and
dismissing the case because plaintiff failed to allege
that the coronavirus had any impact to the premises.

I want to point out that these are not
controlling cases for purposes of an Illinois state
court; however, the court finds that these cases just
cited are, in fact, consistent with Illinois courts
treating of physical damage under insurance policies.

And, of course, there are meaningful
differences at times between first and third party
policies and first and third policy claims; however,
the court finds that there is a consistent line of
reasoning by Illinois courts as far as what physical
damage must mean for purposes of insurance coverage in
this case.

In essence, to quote Judge Gettleman in the
Sandy Point Dental Case, plaintiff here seeks coverage

1    for financial losses as a result of closure orders.

2    And I don't think anybody really disagrees with that

3    here.

4         The coronavirus has not physically altered

5    the appearance, shape, color, structure, or other

6    material dimension of the property and, as a result, it

7    doesn't come within the insuring agreement and, as a

8    result, plaintiff has failed to plead a direct physical

9    loss, which is a prerequisite for coverage.

10        However, I do want to point out here that

11   even if, even if, plaintiff had, in fact, been able to

12   plead within the insuring agreement -- that this claim

13   comes within the insuring agreement, the court does

14   find that the virus exclusion applies.

15        Now, the virus exclusion, which is Exclusion

16   J under Section 1 of the policy, states as follows --

17   and there's important, what we'll call, lead-in

18   language that I want to direct the parties' attention

19   to.  The lead-in language under Section 1 exclusions,

20   which applies to all coverage forms under this all

21   risks policy, all coverage forms incorporate Section 1,

22   the lead-in language states as follows:  We do not

23   insure under any coverage for any loss which would not

24   have occurred in the absence of one or more of the

1    following excluded events.

2         We do not insure for such loss regardless of,

3    A, the cause of the excluded event; or, B, other causes

4    of loss; or, C, whether other causes acted concurrently

5    or in any sequence with the excluded event to produce

6    the loss; or, D, whether the event occurred suddenly or

7    gradually, involves isolated or widespread damage,

8    arises from natural or external forces, or occurs as a

9    result of any combination of these, and it begins to

10   list the exclusions.

11        So the virus exclusion is Exclusion J.  The

12   heading, which does not control, says fungi, virus, or

13   bacteria.  Paragraph 1 states, Growth, proliferation,

14   spread, or presence of fungi or wet or dry rot or, new

15   paragraph, 2, Virus, bacteria, or other microorganism

16   that induces or is capable of inducing physical

17   distress, illness, and disease.

18        For our purposes, those are the relevant

19   provisions of the virus exclusion that needs to be

20   addressed here.  First, the court finds that the

21   growth, proliferation, spread, or presence is not

22   required for purposes of applying the virus exclusion

23   because that is in a separate paragraph designed to

24   address fungus or fungi.  There are not just one but

two disjunctive *or's* in between fungus and virus
because it goes fungus -- or states fungus or wet or
dry rot or and then a new paragraph starting with the
word *virus* enumerated as number two.

So the court finds that it doesn't have to
establish a growth of a virus, just simply the idea of
a virus, the fact that a virus that is capable of
inducing physical distress, illness, or disease.

Even if -- if, in fact, this was some kind of
physical -- accidental physical damage, physical loss
coming within the insuring agreement, the virus
exclusion applies because Subsection C of the lead-in
language says this virus exclusion applies whether
other causes, executive orders, acted concurrently or
in any sequence with the excluded event to produce the
loss.

Here, I think everyone would agree absent the
virus, absent the virus, there would be no executive
orders, and so because C says this exclusion would
apply even where the sequence of the ordering with
other causes isn't entirely known or isn't entirely
clear or happens one two or two one, it still applies.

Furthermore, whether or not a virus could, in
fact, alter the physical structure, I think that's a

1    much -- that's not entirely clear at all that a virus

2    could.

3         And that's plaintiff's -- or I'm sorry,

4    insured's argument is the virus exclusion doesn't make

5    any sense for a sort of physical alteration requirement

6    of physical damage -- or a loss of, I should say --

7    physical loss because a virus would never alter the

8    physical structure.

9         The court doesn't agree with that.  Virus,

10   bacteria, and microorganisms can exist in, in fact, a

11   meaningful way, and I think there's a strain of thought

12   out there that at one time was dominant -- it still may

13   be true to a certain extent -- that this virus can

14   exist on surfaces.

15        So even if the loss of use because of

16   coronavirus could constitute, the virus exclusion would

17   still apply -- could constitute physical -- accidental

18   physical loss, direct physical loss, I should say --

19   the virus exclusion applies.

20        And so for those reasons, the court is going

21   to grant the motion to dismiss.

22        I want to point out -- or I do want to

23   address the authority provided by Harold's Chicken --

24   It's Nice, Inc., d/b/a Harold's Chicken.  A couple

things, I think, are worth pointing out.

One is the State Farm language here -- not only are those cases from the western district and, as a result, they're not controlling, the court believes or is of the opinion that the cases relied upon for its ruling today are more consistent with Illinois law as it exists with respect to this issue.

Furthermore, the policy language was different in those western district cases. And that's not to say that the result would be different if you had identical language, but I do think that's different language.

And, moreover, and perhaps importantly, the court was evaluating a 12(b)(6) motion in which the insureds in that case allege the presence of COVID on the property. And, to the court's mind, that is a -- that's a meaningful distinction here.

And, again, there's no virus exclusion in that policy that the court would have had to have considered as well and we don't know what the court would have done in that case.

But I do think, at least for purposes of the insuring agreement argument, those cases are distinguishable without regarding -- without, you know,

advising as to what the result would be in this court.
But I do think those are different cases and they need
to be treated differently as such.

And so, for those reasons, the court is going
to go ahead and grant the motion both with respect to
the insuring agreement argument as well as with respect
to the virus exclusion.

I do want to point out, for the record, the
insured does not seem to argue -- kind of seems to have
one foot in and one foot out on civil authority.
They're happy to find civil authority coverage if it
exists, but they're not specifically asking for it.

But I want to point out, for the record,
that, as noted above, the policy's civil authority
coverage applies only if there is a covered cause of
loss, meaning direct physical loss, again, going back
to direct physical loss to property other than the
plaintiff's property.

Just as the coronavirus did not cause direct
physical loss to plaintiff's property here, the
complaint has not and likely could not allege that the
coronavirus caused direct physical loss to other
property. By the policy's own terms, the civil
authority coverage then does not apply.

1           So with that having been said, I'm granting

2   the motion.  You know, I'm kind of -- do the parties

3   want a dismissal with prejudice?

4       MS. SCHUMACHER:  Your Honor, we are asking for a

5   dismissal with prejudice, the reason being their claim

6   is for the loss of income due to the executive orders

7   which is caused by the virus, and without alleging a

8   completely different kind of claim, there's no set of

9   facts that they're going to be able to allege that's

10  going to avoid that result.

11          The executive orders are full of references

12  to the virus.  The chain of causation is strong.  The

13  virus exclusion is present.  And, again, the same thing

14  with the physical damage issue.  There's no claim that

15  there was any structural alteration to the property.

16          So I think in this case, your Honor, on that

17  basis, I don't think there's any way they're going to

18  be able to plead around either of those issues, and so

19  we are asking for a dismissal with prejudice.

20      THE COURT:  Mr. Endsley, any response to that or

21  are you in agreement that this is time for other minds

22  to evaluate this claim?

23      MR. ENDSLEY:  Yeah, your Honor, that's probably

24  correct.  I don't think we can change the pleading such

1    that -- to get around the issues that you're finding

2    are insurmountable.

3         THE COURT:  I don't disagree.  It is a 615, and so

4    I do want to just at least give the parties the

5    opportunity to request without -- whether or not I give

6    that is a different issue, but it sounds like the

7    parties are of one mind and the court is in agreement

8    that this dismissal for this type of a 615 motion is

9    and should be with prejudice, and the court will enter

10   such an order.

11        MS. SCHUMACHER:  Thank you, your Honor.

12        THE COURT:  Okay.

13        MR. ENDSLEY:  Thank you, your Honor.

14        THE COURT:  Thank you, guys.  Thank you very much

15   for your time and energy on this.  I want to commend

16   the parties.  I know this is a very interesting issue

17   under very -- a very unique set of facts.

18        MS. SCHUMACHER:  Thank you, your Honor.

19        MR. ENDSLEY:  Thank you, your Honor.

20        THE COURT:  Thank you.

21                  (Which were all the proceedings had at

22                   the hearing of the above-entitled

23                   cause, this date.)

24

1    IN THE CIRCUIT COURT OF THE 18TH JUDICIAL CIRCUIT

2    DU PAGE COUNTY, ILLINOIS

3

4

5            I, KRISTIN M. BARNES, do hereby certify that

6    the foregoing Report of Proceedings, consisting of

7    Pages 1 to 39, inclusive, was reported in shorthand by

8    me via Zoom videoconferencing, and the said Report of

9    Proceedings is a true, correct and complete transcript

10   of my shorthand notes so taken at the time and place

11   hereinabove set forth.

12

13

14

15   _____

16                Official Court Reporter
          Eighteenth Judicial Circuit of Illinois
17                    DuPage County
                CSR License No. 084-004026
18

19

20

21

22

23

24